# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OAKLAND BULK & OVERSIZED TERMINAL, LLC,
*Plaintiff-Appellee*,

v.

CITY OF OAKLAND,
*Defendant-Appellant*,

and

SIERRA CLUB; SAN FRANCISCO BAYKEEPER,
*Intervenor-Defendants-Appellants*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OPENING BRIEF OF DEFENDANT-APPELLANT
## CITY OF OAKLAND

BARBARA J. PARKER
  *City Attorney*
MARIA S. BEE
  *Chief Assistant City Attorney*
JAMILAH A. JEFFERSON
  *Senior Deputy City Attorney*
One Frank H. Ogawa Plaza, 6th Floor
Oakland, CA 94612
(510) 238-7686

JAMES M. FINBERG
STACEY LEYTON
ANDREW KUSHNER
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
(415) 421-7151

*Attorneys for Defendant-Appellant City of Oakland*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

STATEMENT OF JURISDICTION ........................................................................ 6

ISSUES PRESENTED FOR REVIEW .................................................................... 6

STATEMENT OF THE CASE ................................................................................. 7

    I.     OBOT's Development Agreement ............................................................ 7

    II.    OBOT's Hidden Plans to Construct a Coal Terminal .............................. 9

    III.   The City Council's Public Hearings Regarding Health and Safety ........ 11

         A. Health-Related Effects ...................................................................... 16

         B. Safety-Related Effects ...................................................................... 20

    IV.   The Ordinance and Resolution .............................................................. 21

    V.    Litigation History ................................................................................. 22

STANDARD OF REVIEW ................................................................................... 26

ARGUMENT ......................................................................................................... 27

    I.     Section 3.4.2 of the Development Agreement required the District Court to review for "substantial evidence." .................................................... 30

    II.    The District Court's use of extra-record evidence requires reversal ........ 34

         A. Section 3.4.2 precluded the District Court from considering extra-record evidence .................................................................................. 34

         B. The District Court erred in relying on extra-record evidence ............. 36

    III.   The District Court's non-deferential review of the record also requires reversal .............................................................................................. 39

         A. Section 3.4.2 permitted the District Court to consider only whether substantial evidence supported the City's determination ................... 39

         B. The District Court's criticisms do not undermine the substantial evidence in the Council record that supports the City's determination. ................................................................................... 42

1. Health-related evidence before the Council...................................43

    a. The District Court erred in crediting unsupported assertions about mitigation measures. ......................................................44

    b. The District Court erred in rejecting emissions estimates based on the "fine coal dust on concrete pad" threshold friction velocity value. ..........................................................................49

    c. The District Court impermissibly substituted its judgment for expert opinion on the issue of local conditions ........................51

    d. The District Court's conclusion about Best Available Control Technology does not undermine the City's determination.......52

    e. The District Court relied on erroneous assumptions about BAAQMD's powers. ...........................................................53

    f. The District Court erred in insisting on air modeling to adopt the Resolution ....................................................................55

2. Safety-related evidence before the Council ...................................59

IV. Remand for Entry of Judgment for Oakland on OBOT's Contract Claim is Warranted........................................................................61

CONCLUSION ..............................................................................63

STATEMENT OF RELATED CASES ................................................64

CERTIFICATE OF COMPLIANCE ...................................................65

# TABLE OF AUTHORITIES

**Cases**

*Alaska Dep't of Envtl. Conserv. v. E.P.A.*,
540 U.S. 461 (2004) ..................................................................... 18, 59

*American Trucking Ass'ns, Inc. v. E.P.A.*,
283 F.3d 355 (D.C. Cir. 2002) ..................................................... 58, 59

*Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*,
622 F.3d 1094 (9th Cir. 2010) .............................................................48

*Berkeley Hillside Preservation v. City of Berkeley*,
60 Cal.4th 1086 (2015) ...................................................... 32, 40, 41, 57

*California Building Indus. Ass'n v. Bay Area Air Quality Mgmt. Dist.*,
62 Cal.4th 369 (2015) ................................................................. 16, 54

*Cavers v. Cushman Motor Sales*,
95 Cal.App.3d 338 (1979) ............................................................ 28, 61

*City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.*,
56 Cal.4th 729 (2013) .........................................................................40

*Cotta v. City and Cnty. of San Francisco*,
157 Cal.App.4th 1550 (2007) ................................................. 40, 42, 63

*Desmond v. Cnty. of Contra Costa*,
21 Cal.App.4th 330 (1993) ..................................................................41

*Devenpeck v. Alford*,
543 U.S. 146 (2004) .............................................................................36

*Doe v. Regents of the Univ. of Cal.*,
5 Cal.App.5th 1055 (2016) ..................................................................33

*Environmental Protection Info. Ctr. v. Cal. Dep't of Forestry & Fire Protection*,
44 Cal.4th 459 (2008) .......................................................... 26, 27, 61

*Flores v. Am. Seafoods Co.*,
335 F.3d 904 (9th Cir. 2003) ...............................................................33

*Garrison v. Colvin*,
759 F.3d 995 (9th Cir. 2014) ...............................................................27

*Gray v. Cnty. of Madera*,
167 Cal.App.4th 1099 (2008) ...................................................... 41, 58

*Great Western Bank v. Office of Thrift Supervision*,
916 F.2d 1421 (9th Cir. 1980) ........................................................27

*Heller v. Doe by Doe*,
509 U.S. 312 (1993)........................................................................48

*Kings Cnty. Farm Bureau v. City of Hanford*,
221 Cal.App.3d 692 (1990) ............................................................28

*Kutzke v. City of San Diego*,
11 Cal.App.5th 1034 (2017) ................................... 29, 32, 33, 40

*Larson v. State Personnel Bd.*,
28 Cal.App.4th 265 (1994) ......................................... 4, 29, 34

*Laurel Heights Improvement Ass'n v. Regents of the Univ. of Cal.*,
47 Cal.3d 376 (1988) .....................................................................42

*M.N. v. Morgan Hill Unified Sch. Dist.*,
20 Cal.App.5th 607 (2018) ....................................... 1, 5, 29, 41

*Montrose Chem. Corp. v. Superior Court*,
6 Cal.4th 287 (1993) ......................................................................36

*Mundy v. Lenc*,
203 Cal.App.4th 1401 (2012) ........................................................30

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*,
627 F.3d 730 (9th Cir. 2010) ................................................. 54, 56

*Oakland Heritage Alliance v. City of Oakland*,
195 Cal.App.4th 884 (2011) .....................................................42, 50

*O.W.L. Found. v. City of Rohnert Park*,
168 Cal.App.4th 568 (2008) .................................................... 42, 50

*Royal Thrift & Loan Co. v. Cnty. Escrow, Inc.*,
123 Cal.App.4th 24 (2004) ..................................................... 36, 37

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ................................................... 39, 62

*Sargent Fletcher Inc. v. Able Corp.*,
  110 Cal.App.4th 1658 (2003) ...................................................................46

*Sierra Club v. Cnty. of Napa*,
  121 Cal.App.4th 1490 (2004) ...................................................................46

*South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.*,
  61 Cal.4th 291 (2015) ................................................................ 31, 40, 62

*TIG Ins. Co. of Michigan v. Homestore, Inc.*,
  137 Cal.App.4th 749 (2006) ....................................................................31

*Toyota of Visalia Inc. v. New Motor Vehicle Bd.*,
  188 Cal.App.3d 872 (1987) ............................................................... 34, 35

*Trunk v. City of San Diego*,
  629 F.3d 1099 (9th Cir. 2011) .................................................................62

*United States v. W.R. Grace*,
  504 F.3d 745 (9th Cir. 2007) ...................................................................36

*Western States Petroleum Ass'n v. Superior Court*,
  9 Cal.4th 559 (1995) ........................................................... 34, 35, 40

**Statutory Authorities**

28 U.S.C. §1291 ..................................................................................... 6

28 U.S.C. §1331 .....................................................................................6

28 U.S.C. §1367 .....................................................................................6

42 U.S.C. §7407 ............................................................................ 19, 20, 24

Cal. Gov. Code §830(a) ..........................................................................28

Oak. Mun. Code §8.60.020........................................................................21

Oak. Mun. Code §8.60.030........................................................................8

Oak. Mun. Code §8.60.040........................................................................21

**Rules and Regulations**

Cal. Code Regs. tit. 14, §15064.7 (2010) ...............................................18

Standards for Particulate Matter, 78 Fed. Reg. 3086-01 (Jan. 15, 2013) ...............18

**Constitutional Provisions**

Cal. Const., art. XI, §7 ....................................................................40

**Additional Authorities**

8 Miller and Starr Cal. Real Estate §30:25 (4th ed.) .................................................7

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In 2013, the City of Oakland ("Oakland" or "the City") entered into a development agreement ("DA") with Plaintiff-Appellee Oakland Bulk and Oversized Terminal, LLC ("OBOT"). The agreement granted OBOT rights to develop a public land parcel adjacent to the Port of Oakland and the San Francisco Bay Bridge, while preserving Oakland's authority to regulate OBOT's development to protect the health and safety of Oakland residents.

The parties to the DA expressly agreed that Oakland could adopt new regulations and apply them to OBOT's development, and agreed on the standard of review that would apply to any judicial challenge to the City's imposition of new regulations. Specifically, Section 3.4.2 of the DA authorized Oakland to impose new regulations upon the development if the "City determines based on substantial evidence and after a public hearing that a failure to do so would place existing or future occupants or users of the Project, adjacent neighbors, or any portion thereof, or all of them, in a condition substantially dangerous to their health or safety." With this provision, the parties incorporated California's "extremely deferential" substantial evidence standard for reviewing any new regulations applied to OBOT in order to protect health and safety. *See M.N. v. Morgan Hill Unified Sch. Dist.*, 20 Cal.App.5th 607, 616 (2018) (internal quotations omitted). This well-established standard requires only that the City's determination be reasonable and

1

supported by some record evidence, and precludes a court from considering evidence not before the Council or re-weighing conflicting evidence. *See infra* at 30-36, 39-42.

After discovering in 2015 that OBOT was pursuing development of a rail-to-ship coal terminal, the Oakland City Council ("Council") studied the health and safety risks associated with handling coal at the terminal over a nearly year-long public hearing process, through which it received over 3,000 pages of material (including several substantial expert reports from scientists and public health professionals). The Council then exercised its authority to adopt the Ordinance and Resolution that are the subjects of this litigation

The evidence before the Council revealed several serious health risks posed by OBOT's plans. Specifically, evidence supported the conclusion that the proposed terminal would increase Oakland residents' exposure to coal dust, which contains toxins like mercury, arsenic, and lead and is made up in part of fine particulate matter that is associated with cardiovascular and respiratory disease and premature death. While health problems manifest even at exposure levels *below* governmental air quality thresholds, evidence before the Council demonstrated that the terminal would likely cause exceedances of those thresholds for fine particulate matter.

The record also revealed safety risks: the serious problems that a coal fire at the terminal would pose, and that there have been recent coal fires at several modern shipping terminals around the world. The harm from even one combustion event during the 66-year term of OBOT's lease to operate the terminal would prove catastrophic for Oakland residents, because a coal fire would release substantial amounts of the harmful toxins and particulates present in coal dust.

Despite Oakland's repeated requests, OBOT declined to participate meaningfully in the public hearings process and did not present evidence that it would later rely on in court. The evidence the Council *did* receive overwhelmingly supports its determination that health and safety risks would result from OBOT's proposed use of the terminal. After considering that evidence and holding a public hearing, the Council adopted an Ordinance prohibiting the storage and handling of coal in Oakland and a Resolution applying that Ordinance to OBOT, based on its determination that failure to do so would result in substantial danger.

OBOT filed suit in federal court to invalidate the Ordinance and Resolution including, as relevant here, on breach of contract grounds. Using *extra-record evidence never presented to the Council*, OBOT argued that the Resolution breached the DA because the evidence did not establish substantial danger. The District Court's conclusion that Oakland had failed to demonstrate the requisite danger, and resultant entry of judgment for OBOT, was based on two fundamental,

3

independent errors, both resulting from its failure to apply the standard set forth in the parties' DA. Although the court acknowledged that substantial evidence review was appropriate, it rejected California case law explicating the substantial evidence framework and thus misapplied the standard.

First, the District Court erred in admitting, and relying on, OBOT's extra-record evidence critiquing the evidence that *was* before the Council regarding the health and safety risks posed by coal. Under the substantial evidence framework explicitly incorporated into Section 3.4.2, "a trial court is obligated to confine itself to the record of the administrative proceeding." *Larson v. State Personnel Bd.*, 28 Cal.App.4th 265, 273 (1994). And even if that standard were not so clear, extra-record evidence cannot possibly be relevant to whether the City's "determination" was supported by "substantial evidence" at the time it was made, which is what Section 3.4.2 identifies as the relevant inquiry. Nevertheless, the District Court relied extensively on extra-record evidence, including alternative particulate matter emissions estimates from OBOT's expert that the court cited in rejecting those in the Council record. This approach disregarded the settled limits of substantial evidence review.

Second, the District Court failed to give the required deference to the Council's determination. When reviewing for substantial evidence, a court must "accept all evidence which supports the successful party, disregard the contrary

4

evidence, and draw all reasonable inferences to uphold the [adjudicatory determination]." *M.N.*, 20 Cal.App.5th at 616. While giving lip service to the substantial evidence standard, the District Court utterly failed to apply it, instead disregarding the Council's reasonable interpretation of the evidence while making a series of its own findings at odds with the record. Specifically, the court concluded that the Council unreasonably failed to account for mitigation measures like coal car covers, even though no scientific evidence was presented to the Council (let alone in court) that such measures are effective. It relied on its own judgment to decide technical questions about the effect of local conditions on OBOT's emissions, rather than deferring to the Council's experts' assessment of those issues. The court wrongly assumed that another regulatory agency would "step in" to protect Oakland residents, ER0025, even though that agency has *no* regulatory authority over the stages of OBOT's operations that would generate most of the harmful particulate matter. Finally, the court ignored credible record evidence in insisting that the Council could not adopt the Resolution without conducting its own air modeling analysis.

The District Court further erred in focusing exclusively on the likelihood of a coal fire, while disregarding the catastrophic effects to human health that would result from even one such event.

The District Court's erroneous decision must be reversed, and the case remanded for entry of judgment in Oakland's favor on OBOT's contract claim. Because the evidence in the Council record provides more than reasonable support for the Council's determination, it is plainly sufficient, when reviewed for substantial evidence, to support the adoption of the Resolution.

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 28 U.S.C. §§1331 and 1367(a). It entered final judgment on May 23, 2018, and Oakland timely filed its notice of appeal on June 13, 2018. ER0053, 59. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court erred by considering evidence that was not presented to the Council in adjudicating OBOT's contract claim, when the parties' development agreement requires that substantial evidence support the City's determination.

2.      Whether the District Court erred in determining that California case law explicating the substantial evidence standard was irrelevant to OBOT's contract claim.

3.       Whether the District Court erred by conducting its own independent assessment of the evidence in the Council record, rather than reviewing under the

6

substantial evidence standard, which asks only whether the Council's

determination based on the evidence before it was reasonable.

**STATEMENT OF THE CASE**

I.      **OBOT's Development Agreement**

After the former Oakland Army Base closed in 1999, some of its land

became the property of Oakland.  ER0005.  One such parcel, the West Gateway

Development Area, is located on the San Francisco Bay just south of the Bay

Bridge Toll Plaza and directly west of the West Oakland neighborhood.  ER0003,

880, 886.  In 2002, Oakland adopted a "Final Reuse Plan" that proposed to

redevelop the area into a mixed-use commercial development involving a range of

land uses, including a marine rail-to-ship terminal designed to transfer bulk

commodities from railcars onto tanker ships.  ER0005, ER0431.[1]  In 2012,

Oakland entered into a Lease Disposition and Development Agreement ("LDDA")

with OBOT's predecessor-in-interest[2] to develop the rail-to-ship terminal on the

West Gateway.  ER0005.[3]

---

[1] Any evidence cited herein that was not before the Council is relied on for background purposes only, not to support the Council's determination.

[2] Prologis/CCIG previously held the rights to develop the terminal.  Because OBOT is CCIG's wholly-owned subsidiary, ER0422, this brief refers to OBOT and its predecessor-in-interest collectively as "OBOT."

[3] Disposition and development agreements are used to convey public property to private entities for development.  *See* 8 Miller and Starr, Cal. Real Estate §30:25 (4th ed.).

A year after signing the LDDA, Oakland and OBOT entered into a development agreement ("DA") for the terminal. ER0005. The DA describes the terminal as a "ship-to-rail terminal designed for the export of non-containerized bulk goods and the import of oversized or overweight cargo." ER2054. It does not mention coal, coke, or any other commodity.[4]

The DA explicitly contemplates future regulation of the terminal. It states that, "[e]xcept as expressly provided in this Agreement and the City Approvals, the Existing City Regulations shall govern the development of the Project," ER1968, but sets forth the following exception in Section 3.4.2:

> Regulation for Health and Safety. Notwithstanding any other provision of this Agreement to the contrary, City shall have the right to apply City Regulations adopted by City after the Adoption Date, if such application (a) is otherwise permissible pursuant to Laws (other than the Development Agreement Legislation), and (b) *City determines based on substantial evidence* and after a public hearing that a failure to do so would place existing or future occupants or users of the Project, adjacent neighbors, or any portion thereof, or all of them, in a condition substantially dangerous to their health or safety ….

ER1970 ("Section 3.4.2") (emphasis added). In February 2016, Oakland and OBOT entered into a 66-year Ground Lease. ER0839, 1947.

---

[4] Coke is a distillate with similar properties to coal. *See* Oak. Mun. Code §8.60.030(A)(3). Because they have similar properties, they are referred to collectively as "coal," unless otherwise noted.

8

## II. OBOT's Hidden Plans to Construct a Coal Terminal

During negotiations over the LDDA and DA, OBOT never acknowledged any plans to develop a coal terminal. In fact, OBOT's principal, Phil Tagami, stated categorically in 2013 that rumors that OBOT was developing a "coal distribution facility" were "simply untrue. … [OBOT] is publicly on record as having no interest or involvement in the pursuit of coal-related operations at the former Oakland Army Base." ER0407. In reality, however, OBOT had discussed coal with potential business partners beginning as early as 2011. ER0414.[5]

Notwithstanding its public denials, in 2014 OBOT signed an Exclusive Negotiating Agreement to sublease the property to Terminal Logistics Solutions ("TLS"), a wholly owned subsidiary of the coal producer Bowie Resource Partners, LLC. ER0006, 418-19, 473-82. Under this arrangement, OBOT would transfer day-to-day control over the terminal to TLS, which would ultimately be responsible for the design, construction, maintenance, and operation of the terminal. ER0005.

In July 2015, OBOT and TLS finally acknowledged their plans for the terminal to handle coal. ER1184-87. Even so, the developers continued to

---

[5] Tagami had been told that transparency about his plans could cause problems. A potential business partner advised him that plans for a coal terminal "could create a political storm," and an OBOT employee told him to "stick with 'bulk goods,' unless they ask" which commodities the terminal would handle. ER0397, 400.

deemphasize that commodity in dealings with Oakland. In September 2015, they submitted a Basis of Design ("BoD") setting forth the basic framework for the terminal's development, calling the commodities involved "Commodity A" and "Commodity B," even though other BoD drafts that OBOT did *not* share with Oakland identified these commodities as "Bituminous Coal" and "Soda Ash." ER0005-6; *compare also* ER1848, *with* ER0381. The BoD states that the terminal can handle nearly 10 million metric tons of bulk commodities per year, and predicts that it will process 5 million metric tons of "Commodity A" (i.e. coal) annually. Because no rule provides otherwise, however, the terminal could handle almost 10 million metric tons of coal each year. ER1847.

The terminal's proposed operations are comprised of three phases: transport, staging, and terminal operations. ER0007. During the transport phase, coal that is mined out of state is transported by railcar, through Oakland, to the Port of Oakland railyard. *Id.* Before arriving at the railyard, the trains will pass by schools, parks, and residential communities in West Oakland. ER0889. The BoD anticipates that incoming trains will have 104 railcars, meaning that they will be over a mile long. ER1670, 1852.

Once the trains arrive at the railyard, the staging phase begins. Trains are segmented into smaller units (e.g., a 104-car train is broken up into four 26-car

segments).  A locomotive then pulls the first segment to the terminal for unloading.  ER0007.

The terminal operations phase then begins, during which each railcar segment is unloaded at OBOT's terminal.  ER0007.  The BoD proposes using bottom-release railcars to release the coal onto a conveyor system that transfers the coal to a storage facility and, ultimately, onto ships for export.  *Id.*

After each segment is unloaded, the locomotive returns to the staging area for the next segment.  ER0007, 943-44.  After all segments have been unloaded, they are reassembled in the staging area.  ER0943-44.  It takes roughly seven hours to segment and unload a 104-car train.  ER0944.

### III.    The City Council's Public Hearings Regarding Health and Safety

When OBOT's plans to develop a coal terminal became known, Oakland informed OBOT and other interested parties that it would hold a City Council hearing regarding the health and safety risks of the proposed terminal.  ER1168-74.  Before the September 2015 hearing, OBOT submitted the BoD and a brief report from HDR Engineering, which contended that public health would "not be harmed" by the proposed terminal.  ER1585.  At the hearing, the Council also received comments from members of the public and government agencies, including two expert analyses of the terminal's public health and safety risks.  ER0882-83, 1617-99.

The first report was prepared by Dr. Phyllis Fox, a Ph.D. in Environmental Engineering from UC Berkeley with over 40 years of experience with air pollution control and air quality management issues, among other relevant topics. ER1655. Dr. Fox reviewed the BoD and concluded that the proposed terminal would cause "[a]dverse public health impacts from coal dust and diesel particulate matter emitted by unit coal trains and the facility." ER1673.

The second report was authored by a team of scientists from Sustainable Systems Research, led by Dr. Deb Niemeier, a professor of Civil and Environmental Engineering at UC Davis whose research focuses on air pollution modeling. ER1691-92. Dr. Niemeier's team concluded that the terminal would "create additional health hazards due [to] increased fugitive coal dust emissions," estimated at 323-646 tons per year, and that there was no evidence of "any scientifically validated methods for mitigating the coal dust." ER1681, 1687. It also reported that the "potential for significant health effects will be borne primarily by" the "vulnerable community" of West Oakland, which is directly adjacent to the terminal and already suffers from disproportionately high levels of air pollution. ER1687.

After the hearing, Oakland sent follow-up questions to OBOT and TLS. ER1740-52. The developers' responses did not include the evidence that OBOT would later rely on in court. *Id*. Instead, in response to questions about the

12

terminal's health and safety effects, OBOT cited only the previously submitted HDR report and argued that existing air quality regulations would adequately protect the public. ER1744. Members of the public submitted additional evidence pertaining to the follow-up questions, and the Council held another public hearing to receive further information. ER0839. By this point, Oakland had received over 200 written comments and heard from hundreds of speakers about the proposed terminal's health and safety risks. ER0883.

Following this May 2016 hearing, two different experts reviewed the public record and reported on the health and safety risks of coal handling. Oakland hired Environmental Science Associates ("ESA"), which analyzed the evidence before the Council and calculated particulate matter emissions for each phase of OBOT's operations, ER0872-73, and concluded that OBOT's proposed activities "would exacerbate already poor air quality" in West Oakland and thereby "contribute to additional health issues experienced by [West Oakland] residents," ER0948. ESA further reported that the terminal presented a serious public safety risk due to the propensity for coal to self-ignite, which poses "both acute and chronic health impacts" for those in close proximity to the fire. ER0876.

Oakland City Councilmember Dan Kalb also commissioned an expert report, from Dr. Zoë Chafe, a public health professional with a master's degree in Public Health and Ph.D. in Energy and Resources from UC Berkeley. Dr. Chafe,

13

whose dissertation addressed ambient air pollution from coal and other combustible products, analyzed the "health effects of coal and coal dust" in both "normal" and "emergency disaster situations." ER1036. In accord with the other experts who presented to the Council, she concluded that the terminal would "very likely" harm human health. ER1030. Dr. Chafe explained that "communities surrounding the proposed terminal site already suffer from exposure to elevated levels of pollution," which the terminal would "exacerbate." *Id.* She also noted the dire consequences of a coal combustion incident, which would likely expose "hundreds of thousands of people" to carcinogenic combustion emissions and toxic "particles, including heavy metals." ER1031.

In June 2016, Oakland held a final public hearing. The Council received the ESA and Chafe reports and additional comments from experts, governmental entities, and members of the public. Among these submissions was a report by the Public Health Advisory Panel ("PHAP"), a group of nine physicians, scientists, and public health professionals with expertise in, among other fields, air quality health effects, epidemiology, oncology, and environmental science. ER1313.[6] The PHAP reviewed the record before the Council, considered additional relevant sources in peer-reviewed journals, and conducted its own air quality assessment for

---

[6] At least 15 other physicians, scientists, and public health professionals endorsed the PHAP report. ER1314.

14

rail transport activities associated with the terminal.  ER1316.  Like other experts, the PHAP concluded that the terminal would "increase exposures to air pollutants with known adverse health effects including deaths," and reported that coal handing poses an "inherent" risk of "catastrophic explosion."  ER1316-17.[7]

OBOT neither presented its own evidence nor asked for additional time to evaluate the evidence before the Council.  Instead, OBOT argued that any analysis of the terminal was "premature" because its design "has not been completed."  ER1283, 1460.  At no point did OBOT submit to the Council *any* of the expert opinions and analyses that it would later rely on in court.  Instead, the OBOT representative who attended the June hearing threatened that OBOT would "pursue all legal remedies" if the Council adopted new regulation.  ER1198.

The extensive evidence before the Council included the following:[8]

---

[7] The record before the Council also contains submissions attesting to the terminal's risks from, among others, Dr. Bart Ostro, former Chief of the Air Pollution Epidemiology Section of California Environmental Protection Agency ("CalEPA") (and author of more than 100 peer-reviewed publications, including many articles on the health effects of air pollution); the Alameda County Public Health Department; and concerned community groups citing the scientific literature.

[8] The parties agreed that a thumb drive lodged in the District Court as Exhibit 640 contains the documents that were submitted to the Council before the Resolution's adoption, ER0259-316, excerpts of which are found at ER0809-2055.

## A. Health-Related Effects

OBOT's proposed terminal is immediately adjacent to West Oakland, a community that both CalEPA and the Bay Area Air Quality Management District ("BAAQMD") have identified as suffering disproportionately from air pollution exposure and resultant adverse health outcomes. ER0925-26, 1071-72, 1323, 1684-85.[9]

Handling coal at the terminal would generate coal dust, which contains numerous toxins, including heavy metals like mercury, lead, and cadmium arsenic. ER0916-17, 1041-42, 1316. Coal dust is also comprised of fine particulates known as $PM_{10}$ and $PM_{2.5}$. ER1039-41, 1316, 1654. $PM_{2.5}$ exposure is especially harmful to human health, as $PM_{2.5}$ particles are extremely small (less than 2.5 micrometers in diameter, or 20 times less than the width of human hair) and thus can penetrate deeply into the lungs, bloodstream, and other internal organs. ER0926, 1039-40. Exposure to $PM_{2.5}$ is linked to premature death, cardiovascular and respiratory disease, and respiratory problems. ER1045-52, 1316, 1654. The risk of these effects directly correlates to the level of $PM_{2.5}$ exposure, meaning that *each* additional increment of exposure can "contribute to the likelihood of adverse

---

[9] BAAQMD is "a regional agency authorized to adopt and enforce regulations governing air pollutants from stationary sources … in the San Francisco Bay Area." *California Building Indus. Ass'n v. BAAQMD*, 62 Cal.4th 369, 378 (2015).

health outcomes." ER1045-46. Nothing in the Council record contradicts, or casts any doubt on, the broad scientific consensus about the dangers of coal dust.

OBOT's proposed operations would generate substantial quantities of this harmful coal dust. ER0875, 1032, 1336, 1654, 1678-81. Three separate reports estimated that activity caused by the terminal would generate 276 to 646 tons of coal dust annually, and one report estimated it would produce roughly 21 tons of $PM_{2.5}$ per year. ER0950, 1336, 1678-81.

ESA specifically calculated $PM_{2.5}$ emissions for each phase of OBOT's operations, and estimated that rail transportation through Oakland would annually generate 6 tons of $PM_{2.5}$, staging 11.7 tons, and terminal operations 2.7 tons, for a total of roughly 21 tons of $PM_{2.5}$. ER0934-46.[10]

The 21 tons of annual $PM_{2.5}$ emissions easily exceed the 10-ton threshold of significance that Oakland and BAAQMD use to identify a "significant and adverse impact on air quality from a particular project." ER0014; *see also* ER0848 (citing Oakland CEQA thresholds of significance). A "threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect" that agencies subject to the California Environmental

---

[10] Although one figure in the ESA report's summary table of emissions estimates contains a typographical error that lists staging emissions as 18 (rather than 11.7) tons of $PM_{2.5}$ per year, the overall total is added up correctly in that table. *See* ER0014. The table in the report that addresses staging also correctly lists the staging emissions estimate as 11.7 tons. ER0945.

Quality Act ("CEQA") use to evaluate "the significance of environmental effects." Cal. Code Regs. tit. 14, §15064.7 (2010). According to BAAQMD, projects with emissions that exceed a threshold of significance "result[] in significant adverse air quality impacts to the region's existing air quality conditions." BAAQMD 2011 CEQA Air Quality Guidelines at 2-1.[11] Accordingly, the Council evidence demonstrated that the terminal would generate over *twice* the amount of $PM_{2.5}$ that BAAQMD has determined will result in "significant adverse air quality impacts."

In fact, $PM_{2.5}$ is so harmful that, according to the Environmental Protection Agency ("EPA"), there is no "threshold, below which it can be concluded with confidence that $PM_{2.5}$-related effects do not occur." National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086-01, 3098 (Jan. 15, 2013); *see also* ER1045-46 (Chafe reporting this to Council), 1338 (same for PHAP). To protect the public from $PM_{2.5}$ and other dangerous pollutants, the EPA has promulgated National Ambient Air Quality Standards ("NAAQS"), which are air quality thresholds for fine particulates and other harmful pollutants. ER0923-24. The NAAQS represent the EPA's determination about "levels of air quality that must be achieved to protect public health and welfare." *Alaska Dep't of Envtl.*

---

[11] http://www.baaqmd.gov/~/media/Files/Planning%20and%20Research/CEQA/BAAQMD%20CEQA%20Guidelines%20May%202011.ashx?la=en; *see also* ER1447 (PHAP citing 2011 Guidelines); ER1904-19 (another commenter citing same).

*Conserv. v. E.P.A.*, 540 U.S. 461, 469 (2004) (internal quotations omitted). The annual NAAQS threshold for $PM_{2.5}$ is 12 µg/m$^3$ (12 micrograms per cubic meter of air) averaged over a three-year period, while the daily NAAQS threshold is 35 µg/m$^3$, with seven days of exceedances permitted per year. ER0029. If a region's air quality fails either the daily or annual standard, it is deemed in "nonattainment." *See* 42 U.S.C. §7407(d). The World Health Organization sets its $PM_{2.5}$ annual threshold even lower, at 10 µg/m$^3$. ER0931.

While adverse health consequences may result from exposure levels below the federal NAAQS and World Health Organization guidelines, ER1045-46, separate commenters independently reported to the Council that OBOT's operations would likely cause $PM_{2.5}$ concentrations to exceed, or nearly exceed, those air quality thresholds. ER0949-50, 1334-37.

First, the PHAP estimated that coal handling could push West Oakland's air quality above the annual NAAQS for $PM_{2.5}$. The baseline $PM_{2.5}$ concentration in West Oakland ranges from 10.2 to 11.5 µg/m$^3$, meaning that West Oakland residents are already exposed to $PM_{2.5}$ concentrations that exceed the World Health Organization's guideline and barely comply with the federal standard. ER0931-32, 1334-35. The PHAP estimated that rail transportation activity associated with the terminal would generate an additional .25 to .625 µg/m$^3$ of $PM_{2.5}$. Accordingly, the additional $PM_{2.5}$ attributable to rail activity *alone*—not even including the terminal

19

and staging phases—could push ambient $PM_{2.5}$ concentrations in West Oakland above the annual NAAQS.  ER1336-37.

Second, ESA concluded that OBOT would emit $PM_{2.5}$ quantities "likely to cause additional exceedances of ambient air quality standards," and thereby "impact the health of … adjacent neighbors."  ER0950.  ESA further explained that the terminal's adjacent neighbors are "disadvantaged communities" that suffer from "disproportionate adverse health effects [from] pollution."  *Id*.

### B. Safety-Related Effects

Multiple public health professionals informed the Council that coal generates coal dust and releases methane gas, which are both prone to spontaneous combustion.   ER0956, 1086-87, 1362-63.  The risk is especially acute inside enclosed spaces (like OBOT's proposed enclosed conveyor and storage areas), where coal dust and methane can become sufficiently concentrated to spontaneously combust.  ER0957, 1087, 1362-63, 1670.

In fact, fires at coal storage, handling, and shipping facilities are not uncommon.  Recently, over a dozen rail car coal fires have been reported in the United States, and coal fires have also occurred at terminals in Los Angeles, Scotland, and Australia.  ER0957, 1088-90.  The two Los Angeles fires are especially concerning because they occurred at a modern, "world-class" terminal.  *See* ER1564.

20

A coal fire would be "catastrophic" for West Oakland residents and the City as a whole. ER1317. Dangerous compounds present in coal (like mercury, hydrogen cyanide, and cadmium) are released during combustion and can be ingested when breathing smoke from a coal fire. ER0959. When ingested, those chemicals become "bioavailable," meaning that they can have toxic effects on the human body. ER0918, 959.

Coal fires are also difficult to extinguish, and dangerous to first responders and others in the vicinity. Fighting coal fires requires special equipment; in many cases, water cannot be used. ER0958, 1093. Moreover, OBOT's location on the San Francisco Bay could exacerbate the difficulty of fighting a coal fire. ER0958.

## IV.    The Ordinance and Resolution

After considering the extensive evidence before it, the Council voted to approve Ordinance No. 13385 ("the Ordinance"), which bars "any Owner or Operator of a Coal or Coke Bulk Material Facility" from "Stor[ing] or Handl[ing] any Coal or Coke." ER0818; *see also* Oak. Mun. Code §8.60.040. The Ordinance includes extensive findings supporting the determination that coal storage or handling "would have many public health and/or safety impacts, including without limitation the creation of conditions that would be substantially dangerous to the health and/or safety of Oakland's Constituents." ER0813; *see also* Oak. Mun. Code §8.60.020.

21

The Council also adopted Resolution No. 86234 ("the Resolution"), which applied the Ordinance to OBOT based on the express finding and determination that, "based on substantial evidence in the record, after conducting public hearings, that failure to apply [the Ordinance] to [OBOT] would place existing and/or future occupants or users of the Project, adjacent neighbors, or any portion thereof, or all of them, in a condition substantially dangerous to their health and/or safety (as stated in the DA)." ER0829.

## V. Litigation History

OBOT sued Oakland in federal court, asserting that adoption of the Ordinance and Resolution breached OBOT's DA, violated the U.S. Constitution's Commerce Clause, and was preempted by federal law. ER0541-82. Oakland moved to dismiss OBOT's contract claim. Dist. Ct. Dkt. 19. Shortly thereafter, environmental organizations San Francisco Baykeeper and Sierra Club ("Intervenors") moved to intervene as defendants, and proffered a motion to dismiss OBOT's Commerce Clause claim. Dist. Ct. Dkt. 28, 30. The District Court granted Intervenors permissive intervention but limited their participation in the case, and denied both motions to dismiss. ER0040-42.

After discovery, the parties filed cross-motions for summary judgment. Dist. Ct. Dkt. 135, 145, 156. OBOT's contract claim argument relied extensively on Dr. Lyle Chinkin's expert opinions (which were never presented to the Council)

criticizing the evidence before the Council and conducting an independent assessment of air quality issues associated with the proposed terminal. ER0500-10; *see also* ER0483-98 (Chinkin Decl.). Oakland argued that the evidence before the Council was credible and overwhelmingly supported the Council's determination, and OBOT could not now use extra-record evidence to attack that determination. ER0451-61.

The District Court denied the cross-motions for summary judgment on OBOT's contract claim and ordered a bench trial on "the significance of the evidence [of substantial dangerousness] that was before the city council." ER0330:12-14, 334. The court took OBOT's remaining claims under submission pending the trial. ER0334.

At the three-day bench trial, OBOT continued to rely on extra-record evidence to attack the evidence before the Council. OBOT introduced not only the opinions of Dr. Chinkin but testimony from three other individuals who had never testified before or submitted material to the Council. ER0088-107, 118-82, 187-201, 211-230. Oakland and Intervenors objected to OBOT's extra-record evidence as "irrelevant and extra-record." ER0056.

After trial, the District Court issued its Findings of Fact and Conclusions of Law, concluding that "the record before the City Council does not contain

substantial evidence that OBOT's proposed operations would pose a substantial danger to the health and safety of people in Oakland." ER0010.

Initially, the court concluded that while the Council's determination should be reviewed for substantial evidence, it would not apply California case law explicating that standard because "[t]his case is not an administrative law case" but instead involves a "contractual dispute." ER0012. Accordingly, the court concluded that it was not limited to the Council record, and could consider extra-record evidence, on the theory that it "sheds light on the adequacy of the evidence that was actually before the City Council." *Id*.

Consistent with its understanding of the framework for OBOT's contract claim, the District Court relied on OBOT's extra-record evidence to discredit the evidence that was actually before the Council. ER0013-36.

With respect to health-related effects, the court ignored much of the evidence before the Council. Rather than consider the evidence cumulatively, the District Court focused almost exclusively on the ESA report's emissions estimates, and all but ignored reports by the PHAP, Dr. Chafe, and others that also attested to the serious health risks posed by the terminal. And even though they were never presented to the Council, the court relied on Dr. Chinkin's opinions and cited his emissions estimates to conclude that ESA's emissions estimates were "unreliable." ER0013.

Specifically, the court concluded that ESA (1) failed to account for mitigation measures (like railcar covers), even though there is no credible scientific evidence that such measures are effective; (2) chose an incorrect input for its emissions calculations, even though multiple experts who participated in the public hearing process selected the same input as best describing OBOT's operations (and no commenter suggested that a different value would be more appropriate); (3) failed to consider local wind and weather conditions, although a different expert report did consider these factors; and (4) did not adequately account for BAAQMD's regulatory authority, even though there is no dispute that BAAQMD lacked authority to regulate the stages of OBOT's operations that would emit the vast majority of $PM_{2.5}$. ER0015-26. The court also concluded that air dispersion modeling was needed to assess coal dust emissions' effect on Oakland's air quality, even though Section 3.4.2 does not require air modeling and, in any case, the PHAP report contained an alternative air quality assessment that *did* directly assess air quality in Oakland (and found that it could deteriorate to a level that exceeds the federal threshold). ER0026-30.[12]

---

[12] Air dispersion modeling converts *emissions* estimates (measured in terms of weight) to *concentration* estimates (measured in terms of weight per volume of air). In essence, air modeling uses wind and weather patterns to determine how pollution emissions from a specific source affect air quality at different locations around that source. *See* ER0026-27.

The District Court rejected the safety-related evidence before the Council on the ground that it did not establish that coal was more likely to combust than other commodities, and ignored evidence showing that coal combustion carries far more serious consequences than other commodities. ER0033-34. The court also concluded there was insufficient evidence to substantiate the other rationales underlying the Resolution (including that it was necessary to avert the release of harmful toxins like mercury, arsenic, and lead). ER0034-36. Finally, the District Court denied Intervenors' post-trial motion for judgment as a matter of law. ER0036-39.

Based on its determination that the Resolution breached the DA, the District Court declared the Resolution invalid and enjoined Oakland from enforcing it. ER0039. It then entered judgment for OBOT on its contract claim. ER0053.

## STANDARD OF REVIEW

As discussed *infra* at 30-34, the DA provides that any City determination under Section 3.4.2 is reviewed under California's deferential "substantial evidence" standard. In this framework, "the trial court and the appellate courts essentially perform identical roles." *Environmental Protection Info. Ctr. v. Cal. Dep't of Forestry & Fire Protection*, 44 Cal.4th 459, 479 (2008). The appellate court's role, like the trial court's, is to review *the City's determination* under the deferential principles of substantial evidence review, and the appellate court

conducts this inquiry independently, without deference to the trial court's legal or factual determinations. *Id.* ("We review the record de novo and are not bound by the trial court's conclusions.").

This Court applies the same principles in analogous circumstances: "District court review of agency action is generally accorded no particular deference, because the district court, limited to the administrative record, is in no better position to review the agency than the court of appeals." *Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1426 (9th Cir. 1980) (internal quotations omitted). For example, this Court does not defer to a district court's review of the denial of Social Security benefits, because both courts have the same role: to review the agency's determination for substantial evidence. *See, e.g.*, *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014).

## ARGUMENT

The District Court erred in failing to grant judgment for Oakland, because the Council record contained substantial evidence that handling coal at the terminal would present a substantial danger to the health and safety of Oakland residents in the form of increased exposure to coal dust (including toxins and fine particulate matter) and the risk of a dangerous coal fire. That evidence, in the form of expert reports, scientific studies, and public comments, overwhelmingly pointed to the

conclusion that coal presented a substantial danger, and the District Court should have gone no further in adjudicating OBOT's contract claim.

In reaching the opposite conclusion, the District Court made numerous fundamental errors, each of which independently supports reversal.  Initially, although the District Court correctly recognized that Section 3.4.2 of the DA requires that any dispute about the Council's determination regarding new regulation be reviewed for substantial evidence, it did not apply that standard. Under the well-established substantial evidence framework, discretion rested with the Council to determine in the first instance whether the evidence before it contained sufficient evidence of substantial dangerousness.[13]  A court reviewing

---

[13] A "condition" is "substantially dangerous" if it poses a "real and not insignificant" danger.  *Cavers v. Cushman Motor Sales*, 95 Cal.App.3d 338, 349 (1979) (italics omitted); *see also* Cal. Gov. Code §830(a) ("'Dangerous condition' means a condition of property that creates a substantial (as distinguished from a *minor, trivial or insignificant*) risk of injury ….") (emphasis added).  The District Court interpreted the term "substantial" to require comparison to other pollution sources to establish relative harm, such that the City should have "compared emissions from the OBOT project to emissions from other sources nearby" like the "Port of Oakland" and "Bay Bridge toll plaza."  ER0031.  But this interpretation makes no sense, and would make it difficult (if not impossible) to enact public health and safety regulation in polluted areas that most need such regulation. Requiring the City to demonstrate that OBOT's terminal would be dangerous in comparison to existing pollution sources would make it easier to prevent additional pollution in areas with relatively clean air than in the vulnerable and polluted West Oakland community.  Existing pollution sources like the Bay Bridge Toll Plaza (which the City does not control) have already created unsafe air quality in West Oakland, and there is no logical reason why their existence should prevent the City from acting to protect its residents from the additional pollution that OBOT would cause.  *See Kings Cnty. Farm Bureau v. City of Hanford*, 221 Cal.App.3d 692, 721

that determination is required to consider only whether that *determination was reasonable*, which necessarily limits judicial review to evidence that was before the Council. *See Kutzke v. City of San Diego*, 11 Cal.App.5th 1034, 1042 (2017) (affirming under substantial evidence standard because challengers "have not established no reasonable municipality could have reached the same decision as the City").

The District Court utterly failed to follow Section 3.4.2's standard. Rather than "confin[ing] itself to the record of the administrative proceeding," *Larson*, 28 Cal.App.4th at 273, and "accept[ing] all evidence which supports the successful party, disregard[ing] the contrary evidence, and draw[ing] all reasonable inferences to uphold the [adjudicatory determination]," *M.N.*, 20 Cal.App.5th at 616, the court conducted its own, independent review.

The court first erred in admitting extensive extra-record evidence, and crediting it over evidence that was before the Council, in its review of the City's determination pursuant to Section 3.4.2. The District Court's conclusion that OBOT's expert's emissions estimates were more reliable than those submitted to the Council during the public hearing process provides no basis to reverse the Council's determination. Because OBOT never presented those estimates to the

---

(1990) (rejecting reasoning similar to District Court's because it "improperly focused upon the … project's relative effects" and perversely made it more difficult to adopt new regulation "the greater the overall problem").

Council, they cannot possibly illuminate whether the Council's determination based on the evidence before it was reasonable.

Second, the District Court independently erred in its approach to the evidence before the Council. Section 3.4.2 required the court to draw all plausible inferences in Oakland's favor based on the information in the Council record as a whole. Instead of doing so, the court made assumptions about the use and efficacy of mitigation measures and BAAQMD's likely regulation that have no basis in fact, decided technical questions based on its own judgment rather than deferring to the experts who participated in the public hearing process, and rejected credible record evidence that answered the court's concerns about how OBOT's emissions would affect Oakland's air quality.

## I. Section 3.4.2 of the Development Agreement required the District Court to review for "substantial evidence."

Section 3.4.2 identifies the applicable standard by requiring that a determination to adopt new regulation be "based on substantial evidence." The DA further provides that it "shall be governed by and interpreted in accordance with the Laws of the State of California," ER2000, under which a "legal term of art" like "substantial evidence" that appears in a contract "must be understood in [its] technical sense." *Mundy v. Lenc*, 203 Cal.App.4th 1401, 1410 (2012).[14]

---

[14] Because the parties did not discuss Section 3.4.2 during the DA negotiations, ER0500, no extrinsic evidence suggests that "substantial evidence"

The term "substantial evidence," as it appears in Section 3.4.2, therefore must be given its established meaning under California law in the context of review of administrative agencies' and municipalities' factual determinations: evidence that is "reasonable in nature, credible, and of solid value such that a reasonable mind might accept it as adequate to support a conclusion." *South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.*, 61 Cal.4th 291, 303 (2015). Construing Section 3.4.2 otherwise would undermine the parties' bargain. *See TIG Ins. Co. of Michigan v. Homestore, Inc.*, 137 Cal.App.4th 749, 755 (2006) (contract interpretation "must give effect to 'mutual intention' of the parties," which is discerned, to extent possible, "from the written provisions of the contract") (internal quotations omitted).

Other terms in Section 3.4.2 confirm that substantial evidence review applies. By authorizing Oakland to impose new regulations based on its "determin[ation]" in light of the evidence before it, Section 3.4.2 makes clear that judicial review should focus on *the City's determination*. §3.4.2 ("[I]f City determines based on substantial evidence and after a public hearing that a failure to do so would place existing or future occupants … in a condition substantially dangerous to their health or safety."). Whether the City breached Section 3.4.2

should be interpreted other than as a legal term of art requiring deferential judicial review in accordance with the California-law substantial evidence framework.

31

thus depends on the *appropriateness of the City's determination*, which is also the focus of California's substantial evidence standard. *See Berkeley Hillside Preservation v. City of Berkeley*, 60 Cal.4th 1086, 1116 (2015) ("Judicial review of [agency factual] *determinations* is limited to ascertaining whether they are 'supported by substantial evidence.'" (emphasis added).[15]

Even if the DA had been less clear, substantial evidence is the standard that courts ordinarily apply when reviewing a government entity's factual determinations like those that underlie the Resolution. *See Berkeley Hillside Preservation*, 60 Cal.4th at 1114 (when "agency serves as 'the finder of fact' … a reviewing court should apply the traditional substantial evidence standard"); *Kutzke*, 11 Cal.App.5th at 1040 ("court was required to determine whether substantial evidence supported the [City's] findings") (alteration in original). Thus, it makes sense that when setting forth the necessary findings to support imposition of new regulations, the DA clarified that they would need only be supported by substantial evidence.

---

[15] The parties could have drafted Section 3.4.2 otherwise, for instance by allowing Oakland to enforce new regulations against OBOT only "if there *is* substantial evidence that failure to do so would place existing or future occupants … in a condition substantially dangerous to their health or safety." By drafting Section 3.4.2 to focus on the City's *determination*, the parties confirmed that this deferential framework applies.

Although the District Court rightly recognized that the DA required substantial evidence review (ER0011), it misunderstood and misapplied the elements of that standard, reasoning that California-law standards did not apply because OBOT challenged the Resolution via "a contractual dispute" instead of "an administrative law case." ER0012. But the DA explicitly *adopted* the deferential substantial evidence standard that governs administrative law disputes like OBOT's challenge to the Resolution. That standard applies not simply as a matter of administrative law but also *as a matter of contract*, through Section 3.4.2's incorporation of the administrative law principles that apply to judicial review of a determination like the Resolution's adoption.[16] Accordingly, the District Court was required to reject OBOT's contract claim so long as the Council could *reasonably determine* based on the evidence before it that the Resolution was necessary to avoid substantial danger. *See Doe v. Regents of the Univ. of Cal.*, 5 Cal.App.5th 1055, 1073 (2016) ("Only if no reasonable person could reach the conclusion reached by the administrative agency, based on the entire record before it, will a court conclude that the agency's findings are not supported by substantial evidence.") (internal quotations omitted); *Kutzke*, 11 Cal.App.5th at 1042

---

[16] The Ninth Circuit does not defer to a district court's contract construction. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (contract interpretation is "question[] of law reviewed de novo").

(affirming because challengers "have not established no reasonable municipality could have reached the same decision as the City").

While the District Court made numerous errors warranting reversal independent of whether the California-law substantial evidence framework applies, its erroneous conclusion about the standard of review, by itself, requires overturning the decision below.

## II. The District Court's use of extra-record evidence requires reversal.

### A. Section 3.4.2 precluded the District Court from considering extra-record evidence.

When reviewing for substantial evidence, "extra-record evidence can never be admitted to contradict the evidence the administrative agency relied on." *Western States Petroleum Ass'n v. Superior Court*, 9 Cal.4th 559, 579 (1995). Accordingly, in determining whether governmental entities' factual determinations are supported by substantial evidence, "a trial court is obligated to confine itself to the record of the administrative proceeding." *Larson*, 28 Cal.App.4th at 273.

Under the substantial evidence standard Section 3.4.2 incorporated, OBOT was required to "produce *all* existing evidence on [its] behalf *at the administrative hearing*," to give the City the opportunity to consider that evidence as part of its determination. *Toyota of Visalia Inc. v. New Motor Vehicle Bd.*, 188 Cal.App.3d 872, 881 (1987) (emphasis added). Were it otherwise, parties would have a potent incentive to withhold evidence from an adjudicatory agency and then deploy it to

34

attack the agency in court (as in fact OBOT did here). *Id.* Because parties must introduce all evidence that supports their position at the administrative level, extra-record evidence may *not* be admitted based on the justification that it "supposedly reveals" the "inaccuracy" of evidence in the administrative record. *Western States*, 9 Cal.4th at 578. Any such argument "is nothing more than a thinly veiled attempt to introduce conflicting expert testimony to question the wisdom and scientific accuracy of the" City's determination. *Id.*

Even aside from this case law, the DA's language dictates that review be limited to the Council record. Section 3.4.2 requires the City to hold "a public hearing" before making a determination about the need for future regulation. §3.4.2. Implicit in the "public hearing" requirement is the obligation that all relevant evidence be submitted during the hearing process. If interested groups were not required to present all evidence to the Council, the "public hearing" that Section 3.4.2 requires would be an empty formality, which this Court should not construe the DA to require.

Further, whether the Resolution breaches Section 3.4.2 turns on the soundness of *the City's determination* after that public hearing, *see supra* at 30-34, and extra-record evidence is simply irrelevant to that inquiry. Attacking the City's determination with extra-record evidence is akin to arguing that Oakland acted unreasonably by failing to anticipate evidence and arguments that were never

35

presented to it.  That makes no sense.  Information that was not before the Council

does not illuminate the question whether its determination was reasonable.

Instead, the reasonableness of that determination must be measured in the context

of information of which the Council was aware.  *See, e.g.*, *Devenpeck v. Alford*,

543 U.S. 146, 152 (2004) (whether officer acted reasonably under Fourth

Amendment is measured against "facts known to the arresting officer at the time of

the arrest"); *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 295 (1993)

(reasonableness of insurer's coverage denial adjudicated based on "those facts

known by the insurer at the inception of a third party lawsuit") (internal quotations

omitted); *Royal Thrift & Loan Co. v. Cnty. Escrow, Inc.*, 123 Cal.App.4th 24, 40

(2004) (reasonableness of injured party's mitigation efforts "must be judged in the

light of the situation confronting him at the time the loss was threatened and not by

the judgment of hindsight") (internal quotations omitted).[17]

### B. The District Court erred in relying on extra-record evidence.

Rather than limit its review to the Council record, the District Court relied

on OBOT's extra-record evidence to reject the evidence that was before the

Council.  Once again, although the court identified the correct standard by stating

---

[17] For similar reasons, parties may not ordinarily present new evidence on appeal to support reversal of a trial court decision.  *United States v. W.R. Grace*, 504 F.3d 745, 766 (9th Cir. 2007) ("In general, we consider only the record that was before the district court.")

that the Resolution "may only be justified on the basis of evidence that was before the City Council at the time the decision was made," ER0012, it failed to apply that standard and instead repeatedly relied on and cited extra-record evidence. *See, e.g.*, ER0015-17, 20-29, 31 (extensive citations to trial testimony in opinion).

For example, although Dr. Chinkin never presented his alternative emissions analysis to the Council, the District Court *twice* cited it as undermining the estimates that were actually before the Council. First, the District Court relied on Dr. Chinkin's calculations to conclude that the City's expert, ESA, used the wrong "threshold friction velocity," even though no commenter made this argument to the Council. ER0020-22. To calculate $PM_{2.5}$ emissions, ESA relied on an EPA document titled "AP-42," which provides guidance about calculating emissions from different sources of pollution in different settings. ER0020. One input is threshold friction velocity, a numerical value describing the minimum wind speed necessary to move a collection of particles. *Id*. The AP-42 sets forth threshold friction velocity alternatives, which scientists have submitted following experimental observations in different contexts.[18]

---

[18] For example, the relevant AP-42 section includes threshold friction velocity alternatives for "fine coal dust on concrete pad," "ground coal," and "uncrusted coal pile," among others. *See* https://www3.epa.gov/ttn/chief/ap42/ch13/final/c13s0205.pdf.

ESA's report, as well as another in the Council record, calculated emissions using the same threshold friction velocity value—"fine coal dust on concrete pad." ER0020; *see also* ER0934-35, 1688.  No commenter suggested that a different value should be used, or that ESA had used the wrong inputs.  Nevertheless, the District Court cited Dr. Chinkin's calculations based on a *different* threshold friction velocity—"uncrusted coal pile"—and concluded that Dr. Chinkin's estimates were more reliable because "'uncrusted coal pile' … more closely resembles the kind of coal that OBOT would handle."  ER0021.

Second, the District Court relied on Dr. Chinkin's emissions calculations to conclude that ESA's estimates were unreliable because they failed to account for train and wind speed in Oakland, ER0022, even though OBOT never presented those estimates to the Council nor even argued to the Council that ESA should have accounted for local wind and train speed.

The District Court justified its consideration of extra-record evidence on the theory that it "sheds light on the adequacy of the evidence that was actually before the City Council."  ER0012.  But Section 3.4.2 instructs that OBOT's contract claim turns on the soundness of the City's post-hearing determination, which must be measured solely based on information presented to the Council.  The City's determination cannot logically be attacked on the theory that the Council unreasonably relied on the evidence before it instead of Dr. Chinkin's alternative

38

opinions, when those opinions were never presented and in fact at the time of the Council decision did not even exist.

The only reasonable reading of Section 3.4.2 is that it precludes consideration of extra-record evidence. Any other approach ignores relevant case law and fundamentally rewrites the DA by deleting the key phrases "substantial evidence," "public hearing," and "City's determination" from Section 3.4.2. The court never should have considered OBOT's extra-record evidence, much less credited it *over* the Council record evidence. Its decision to do so requires reversal. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602-04 (9th Cir. 2014) (holding district court "overstepped its bounds" by admitting expert declarations not in agency record).

### III. The District Court's non-deferential review of the record also requires reversal.

#### A. Section 3.4.2 permitted the District Court to consider only whether substantial evidence supported the City's determination.

Although the District Court recited the substantial evidence standard (ER0011), it failed to cabin its analysis to the question whether the Council record contained substantial evidence, or to apply the specific legal principles that guide courts in this inquiry. These errors independently require reversal.

"Substantial evidence" is a "legal term of art" with a specific definition under California law: evidence that is "reasonable in nature, credible, and of solid

value." *South Coast Framing*, 61 Cal.4th at 303. "[T]he reviewing court's 'role'

in considering the evidence differs from the [City's]." *See Berkeley Hillside*

*Preservation*, 60 Cal.4th at 1114. The *City's* role is to "weigh the evidence" in the

first instance. *Id*. (internal quotations omitted). A *court*, by contrast, defers to the

City's weighing of the evidence by reviewing its determination only for

"substantial evidence," *id*., or reasonableness. *Kutzke*, 11 Cal.App.5th at 1042

(affirming because challengers "have not established no reasonable municipality

could have reached the same decision as the City").[19]

---

[19] Important constitutional considerations underlie the substantial evidence standard. *See Western States*, 9 Cal.4th at 576 (full-blown independent judicial review of agency determinations would "usurp the agency's authority and violate ... separation of powers"). Similarly, the substantial evidence standard preserves *municipalities'* latitude to decide what action is necessary to protect their residents. The California Constitution empowers cities to adopt "all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, §7. This "inherent local police power includes broad authority to determine, for purposes of the public health, safety, and welfare, the appropriate uses of land," *City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc*., 56 Cal.4th 729, 738 (2013), and is so potent that, ordinarily, any contract that has "the effect of surrendering or impairing the police power" is void as against public policy. *Cotta v. City and Cnty. of San Francisco*, 157 Cal.App.4th 1550, 1557 (2007).

Here, the DA does not mention coal (and thus does not grant OBOT any express or vested right to handle coal) but does expressly preserve Oakland's police power authority, consistent with this constitutional authority. Even if the DA were silent as to the applicable standard, substantial evidence would apply. Reviewing Oakland's determination to regulate a commodity that the DA does not grant OBOT an express right to handle under a standard more onerous than "substantial evidence" would impermissibly "usurp" that authority. *Cf. Western States*, 9 Cal.4th at 576.

Review under this standard begins by presuming the correctness of the City's determination. *Desmond v. Cnty. of Contra Costa*, 21 Cal.App.4th 330, 335 (1993) ("[I]t is presumed that the findings and actions of the administrative agency were supported by substantial evidence"). A reviewing court, "after resolving all evidentiary conflicts in the agency's favor and indulging in all legitimate and reasonable inferences to uphold the agency's finding, must affirm that finding if there is any substantial evidence, contradicted or uncontradicted, to support it." *Berkeley Hillside Preservation*, 60 Cal.4th at 1114. Accordingly, the existence of evidence that supports a different decision is not a basis for reversal. Rather, under this "extremely deferential standard of review," courts must "accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the [adjudicatory determination]." *M.N.*, 20 Cal.App.5th at 616.

Because courts' focus in the substantial evidence framework is on the evidence that *supports* the adjudicatory determination, a decision not to conduct additional analysis, even if that analysis would be useful, is not reason to reverse. *Gray v. Cnty. of Madera*, 167 Cal.App.4th 1099, 1125 (2008) ("The fact that additional studies might be helpful does not mean that they are required"; affirming because information city *did* consider was "sufficient to constitute substantial evidence").

Nor is a city's reasonable choice between competing methodological approaches grounds for reversal under the substantial evidence standard. *O.W.L. Found. v. City of Rohnert Park*, 168 Cal.App.4th 568, 593 (2008) ("[I]t is not for this court to weigh the relative merits of different studies"); *Oakland Heritage Alliance v. City of Oakland*, 195 Cal.App.4th 884, 900 (2011) ("public agency may choose between differing expert opinions"). Accordingly, a court may not reverse on the ground that a different choice between reasonable alternatives "would have been equally or more reasonable." *Oakland Heritage*, 195 Cal.App.4th at 900; *see also Laurel Heights Improvement Ass'n v. Regents of the Univ. of Cal.*, 47 Cal.3d 376, 409 (1988) ("[T]he issue is not whether the studies are irrefutable or whether they could have been better. The relevant issue is only whether the studies are sufficiently credible to be considered *as part of* the total evidence that supports" the determination.) (emphasis in original). So long as the *City's* choice based on the evidence before it was reasonable, the District Court was required to reject OBOT's claim.

## B. The District Court's criticisms do not undermine the substantial evidence in the Council record that supports the City's determination.

The District Court's misapplication of the substantial evidence standard led it to conduct its own review of the evidence, rather than deferring to the City's

determination based on that evidence.  The record evidence is plainly sufficient to support the Resolution's adoption.

### 1.  Health-related evidence before the Council

The Council record contains extensive evidence from multiple sources attesting to the risk that OBOT's proposed operations would pose to human health. *See supra* at 16-20.

Initially, it is undisputed that West Oakland residents are already disproportionately affected by pollution, and exhibit high rates of emergency room visits and hospitalizations from pollution-related health problems like asthma and cancer.  ER0925-26, 1071-72, 1323, 1684-85.

It is similarly undisputed that OBOT's terminal, which would be directly adjacent to this vulnerable community, would generate fugitive coal dust, which contains heavy metals (including mercury, lead, and cadmium arsenic) and the fine particulate $PM_{2.5}$.  ER0916-17, 1041-42, 1316.  Nor is there any dispute that $PM_{2.5}$ is associated with cardiovascular and respiratory disease, and premature death. ER1039-41, 1316, 1654.  Each additional increment of exposure may "contribute to the likelihood of adverse health outcomes," and health issues can arise at exposure levels below the thresholds set by governmental organizations.  ER1045-46.

The Council record establishes that OBOT's proposed terminal would generate roughly 21 tons of dangerous $PM_{2.5}$ annually, which is more than double the 10-ton figure that BAAQMD identifies as the level at which "significant adverse air quality impacts" occur. ER0950; BAAQMD CEQA Air Quality Guidelines, *supra* at n.11. Two expert reports also concluded that the proposed terminal would likely generate sufficient $PM_{2.5}$ to push ambient concentrations in Oakland above the relevant federal air quality threshold. ER0950, 1334-35.

Instead of crediting this evidence, the District Court made assumptions about mitigation measures that are flatly contradicted by the record, disregarded the consensus among the City's experts about the proper inputs for emissions calculations, independently assessed the effect of local conditions on OBOT's emissions instead of deferring to the City's experts' assessments, put far too much faith in BAAQMD's limited regulatory authority, and wrongly discarded credible record evidence in insisting that the Council was required to conduct air modeling analysis. These errors each independently require reversal of the judgment.

### a. The District Court erred in crediting unsupported assertions about mitigation measures.

The District Court concluded that Oakland's determination failed to account for mitigation measures like coal car covers or surfactants that it believed would

reduce coal dust emissions.[20] ER0015-17. But undisputed information in the

Council record revealed the complete absence of scientific data supporting the

effectiveness of such mitigation measures. (In fact, even the extra-record evidence

presented at trial did not support the efficacy of these measures.) By rejecting this

evidence and instead asking for more proof relating to mitigation measures, the

District Court impermissibly shifted the burden of proof on the issue.

To begin, it is undisputed that coal car covers (1) are not in commercial use;

and (2) have never been experimentally tested, let alone proven effective at

reducing coal dust emissions. ER0896-98, 1342-44, 1664, 1669-70, 1681-83.[21]

Accordingly, the Council's reliance on emissions calculation that did not presume

emissions reductions based on coal car cover use is not only reasonable but the

*only* logical determination based on the evidence.

Nevertheless, according to the District Court, the "lack of existing data about

the effectiveness" of coal car covers did not allow the Council to reasonably

disregard them as a potential mitigation measure. ER0016. But *OBOT* had the

burden to prove that Oakland breached Section 3.4.2 by relying on emissions data

---

[20] Surfactants are chemicals sprayed on coal at specialized "spray facilities," ER0900, that allegedly "help keep the coal intact" and thus "decrease[] the amount of fugitive coal dust," ER0017.

[21] Even at trial the only such evidence OBOT presented concerned a single mine's use of covers to transport lignite, which, though related to coal, is "a totally different product." ER0081:17-25, 97:18-98:15.

that did not properly account for coal car covers, both because it was the plaintiff and under the substantial evidence standard. *See Sargent Fletcher Inc. v. Able Corp.*, 110 Cal.App.4th 1658, 1667 (2003) ("Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.") (internal quotations omitted); *Sierra Club v. Cnty. of Napa*, 121 Cal.App.4th 1490, 1497 (2004) (substantial evidence standard "presume[s decisions are] correct," and places burden of proof on challenger). OBOT thus bore the burden of proving that the City's decision not to assume that coal car covers would mitigate emissions was unreasonable. Because no evidence in the Council record (or indeed anywhere) shows that coal car covers are effective, OBOT cannot possibly carry that burden.

By forcing Oakland to come forward with affirmative evidence that coal car covers are *ineffective*, the court also held Oakland to an impossible standard. Given that current science "lack[s] existing data" about coal car covers, the court's demand for *more* evidence of their "impact," ER0015, 16, essentially requires the City to conduct experiments on the issue. That cannot be what is required of a municipality to adopt health and safety regulation, under any standard of judicial review, especially when it is unclear *how* Oakland could conduct experiments to measure the effectiveness of a product that is not commercially available.

Provided with unanimous evidence that coal car covers are *not* in use, Oakland was entitled to act based on that understanding.

The District Court's conclusion that surfactants "should have factored into the City's analysis" is similarly flawed. ER0017. As with coal car covers, no "objective scientific data" support the effectiveness of surfactants. ER902. The single reported scientific study on the subject documented significant *spikes* in $PM_{2.5}$ immediately after the passage of coal trains that were required to have been treated with surfactants. ER1337 ("average peak in $PM_{2.5}$ concentrations near coal trains" required to use surfactants "was twice that of those carrying other freight"). Further, the Council record showed that the coal industry itself has argued in pending litigation that surfactants are generally ineffective. ER1344-45.

Rather than acknowledge that the Council record permitted the reasonable conclusion that surfactants would be ineffective at reducing health risks, the District Court seized on a single statement in ESA's report that surfactants degrade over time and so would be less effective at the end of the 700-mile journey from Utah to Oakland, and posited that reapplying surfactants would solve the problem. ER0018. But OBOT never represented to the Council that it would require reapplication, as ESA noted in its report. ER900. And regardless of whether surfactants are reapplied, there is no scientific evidence in the Council record that *surfactants are effective*.

47

By contending that Oakland needed to do more to prove that mitigation measures would be ineffective, the court essentially required Oakland to prove that less restrictive alternatives to the Resolution would have been insufficient. That is not the standard. Neither Section 3.4.2 nor the DA as a whole requires Oakland to prove that alternative measures would be impracticable. Rather, it requires only that the City determine based on substantial evidence that new regulation is needed to avoid a substantially dangerous condition. The District Court's contrary approach is both inconsistent with the DA and the settled approach to judicial review of economic regulations like the Resolution. *Cf. Heller v. Doe by Doe*, 509 U.S. 312, 330 (1993) (less restrictive alternatives are "irrelevant" under rational basis standard that governs judicial review of economic regulation).

Moreover, contrary to the District Court's speculative conclusion that BAAQMD "or another agency could impose regulations" requiring surfactants or coal car covers, ER0018, the Council could reasonably have been concerned that BAAQMD lacked such authority over the relevant phases of operations. *See Ass'n of Am. R.Rs. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010) (federal law preempts rules that "apply exclusively and directly to railroad activity" by "requiring the railroads to reduce emissions"). In fact, OBOT argued to the Council that any "regulations or restrictions" on rail transportation (as

48

opposed to, for example, operations at the terminal itself) would likely be preempted.  ER1751-52.

The District Court also erred in crediting OBOT's supposed "willingness to commit itself contractually to using surfactants."  ER0018.  OBOT's "willingness" was conditional: OBOT specified that any promise to agree to such measures "shall not be binding on OBOT" until memorialized in a written agreement with the City, which raised questions about whether OBOT would demand concessions in exchange.  ER1746.  In any case, OBOT's unilateral promise to self-regulate provided no guarantee that Oakland's residents would be protected, and did not preclude the City, in accordance with Section 3.4.2, from concluding that there was substantial evidence that coal transport presented a substantial risk to residents' health.  OBOT's unenforceable vow to use technology of unproven effectiveness is of little worth, and does not require that Oakland forbear from regulating.

> **b. The District Court erred in rejecting emissions estimates based on the "fine coal dust on concrete pad" threshold friction velocity value.**

The District Court rejected the emissions estimates before the Council on the ground that they "resulted from a misapplication of federal guidance."  ER0020.  Aside from erroneously relying on extra-record evidence on this issue, *see supra* at 37-39, the District Court also mistakenly concluded that ESA's calculations were flawed.  Because applying federal guidance regarding emissions estimates involves

49

scientific judgment, the Council was entitled to rely on its experts' opinions on the issue. At most, the court's criticisms amount to impermissible second-guessing of the Council's reasonable choice among methodological alternatives.

The relevant AP-42 section contains only six different settings in which threshold friction velocity for coal has been measured, none of which is a coal terminal.[22] Accordingly, it is undisputed that none of the available threshold friction velocity figures precisely describes conditions at the proposed terminal, so experts had to choose the setting that they believed to be most analogous. The two expert reports that used AP-42 guidance both decided that the "fine coal dust on concrete pad" figure best approximated conditions at the terminal. *See* ER0934-51, 1688-89.[23]

Under the substantial evidence standard, the Council was entitled to rely on this expert consensus, and the District Court was required to defer to that choice. *Oakland Heritage*, 195 Cal.App.4th at 900 ("[A] public agency may choose between differing expert opinions") (internal quotations omitted); *O.W.L. Found.*, 168 Cal.App.4th at 593 ("It is not for this court to weigh the relative merits of different studies"). Thus, even if Dr. Chinkin's opinions about threshold friction

---

[22] *See supra* at n.18.

[23] Oakland's trial emissions expert also testified that the threshold friction velocity on which the Council relied was the best choice among those available. ER0074:1-75:21.

velocity were admissible, the court *still* would have erred by crediting his testimony over these experts' opinions.

### c. The District Court impermissibly substituted its judgment for expert opinion on the issue of local conditions.

The District Court also criticized the Council for relying on estimates that employed a constant rate of emissions during the journey from Utah to Oakland, because "common sense suggests" that "train speed and ambient wind speed would affect" emissions. ER0022. Here, the court again disregarded the limits of substantial evidence review by relying on extra-record evidence, *see supra* at 38-39, substituting its own idea of "common sense" for the opinions of scientific experts, and ignoring evidence in the Council record that addressed its objection.

Contrary to the District Court's assumption, whether coal dust is emitted at a constant rate is *not* a simple matter of common sense. Instead, that question implicates matters of technical and scientific expertise on which experts can differ (as evidenced by the disagreement between experts on this issue). As with the choice among threshold friction velocity alternatives, the court's role was not to second-guess the Council's determination. *See supra* at 50-51.

In any case, the Council record *did* contain evidence that answers the District Court's criticism. Specifically, the PHAP estimated ambient $PM_{2.5}$ concentrations resulting from coal-filled railcars traversing Oakland. In doing so,

the PHAP *accounted for local train speed and ambient wind conditions*.  ER1337

("In developing the estimates below, we are assuming a 30 MPH train speed

through Oakland" (based on OBOT's submission to Council), and citing seasonal

wind patterns and speeds).  That estimate predicted that OBOT's operations would

cause air quality in Oakland to exceed, or nearly exceed, the annual NAAQS for

$PM_{2.5}$.  The District Court simply ignored this evidence, which addressed its

concerns about the effect of local conditions.

> ### d. The District Court's conclusion about Best Available Control Technology does not undermine the City's determination.

The District Court also concluded that the emissions estimates were invalid

because they failed to assume that BAAQMD would require OBOT to employ

Best Available Control Technology ("BACT").  ER0022-23.[24]  This conclusion

contradicts the evidence in the Council record.  The ESA report, which provided

the only emissions estimates in the record for terminal operations, attests that it *did*

consider BACT.  ER0945-46.

In any case, because of limits on its authority, *see infra* at 53-55, BAAQMD

could require BACT only for terminal operations (estimated to generate 2.7 tons of

$PM_{2.5}$ annually), and not the rail transport or staging phases (estimated at 6 tons for

---

[24] BACT is shorthand for "the most effective emissions controls that are both technologically feasible and cost effective."  ER0022-23.

rail transport through Oakland and 11.7 tons for staging annually).  Even without

terminal operations, then, the overall project would generate nearly 18 tons of

PM$_{2.5}$ per year, which still *far* exceeds the City's and BAAQMD's threshold of

significance.  Any dispute about BACT does not undermine the City's

determination.

### e.  The District Court relied on erroneous assumptions about BAAQMD's powers.

The District Court rightly recognized that Oakland is "probably" not

required to "take it on faith" that other regulations (like those promulgated by

BAAQMD) "will adequately protect people."  ER004.  Yet it concluded that the

Council failed to account for "the broad scope of the Air District's regulatory

power or the effect it would likely have on the proposed coal operations."

ER0026.  This too was error.

Initially, coal or petcoke terminals currently operate in BAAQMD's

jurisdiction in Benicia and Richmond, California, ER903, but BAAQMD has *never*

promulgated specific regulations governing them.  The District Court completely

ignored this, and instead assumed without any basis that BAAQMD would "step

in" to prevent substantial dangerousness.  ER0025.

Moreover, the court erroneously conceived of BAAQMD's authority to

"step in" as "broad."  ER0025-26.  BAAQMD has jurisdiction only over OBOT's

terminal itself, and cannot regulate rail transport and staging activities *outside* of

OBOT's property.  *See California Building Indus. Ass'n*, 62 Cal.4th at 378

(BAAQMD is "authorized to adopt and enforce regulations governing air

pollutants from *stationary* sources such as factories, refineries, power plants, and

gas stations in the San Francisco Bay Area"); *Nat'l Ass'n of Home Builders v. San*

*Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir.

2010) (California's Air Districts "regulat[e] *stationary* sources of pollution")

(emphases added).[25]  The rail transport and staging activities that occur outside the

fenceline are estimated to generate 6 and 11.7 tons of $PM_{2.5}$, respectively—far

more than the 2.7 tons generated by the terminal operations that BAAQMD can

regulate.

The scope of the South Coast Air Quality Management District's

("SCAQMD") Rule 1158, which addresses the handling of coal and petcoke at

terminals in Southern California, illustrates the limits of Air District authority.  *See*

ER0016-17 (District Court citing Rule 1158 as type of regulation BAAQMD could

be expected to promulgate to address air quality issues).  That rule requires the

moistening "upon arrival" of coal shipped *by rail to* a SCAQMD facility and that

---

[25] Even OBOT's trial expert recognized that BAAQMD's authority is
limited to activities "inside the fenceline of a facility."  ER0183:8-15.

only coal *loaded from ships onto railcars at a SCAQMD facility* use coal covers or another "method of control." Rule 1158, subparts (d)(12), (k)(9).[26]

The limits of Rule 1158, which result from Air Districts' limited power to regulate, support the Council's determination that OBOT's plans posed a substantial risk despite BAAQMD's authority. BAAQMD could not require mitigation measures for incoming coal until "arrival" at the facility—that is, *after* the rail transport and staging activities that ESA estimated would generate nearly 18 of the 21 tons of $PM_{2.5}$ attributable to OBOT. The Council could therefore reasonably determine that, because of its limited jurisdiction, any BAAQMD regulation would be insufficient to protect residents.

### f. The District Court erred in insisting on air modeling to adopt the Resolution.

Finally, the District Court faulted the Council for not having ESA perform air modeling. Air modeling converts emissions estimates to concentration estimates by using wind and weather patterns to model where particulate matter is likely to travel. *See supra* at n.12. Without modeling, the District Court reasoned, the Council could not meaningfully assess how coal dust emissions "would actually affect air quality in Oakland." ER0026-27.

---

[26] http://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1158.pdf.

However, the Council record *did* contain such a meaningful assessment, in the PHAP report. The PHAP started with the baseline ambient $PM_{2.5}$ concentrations for Oakland, which it obtained from existing published reports of data from monitors placed throughout Oakland by BAAQMD and other entities. ER1334-35. These sources reported baseline $PM_{2.5}$ concentration in the immediate vicinity of the terminal as 11.5 µg/m$^3$, barely under the NAAQS of 12 µg/m$^3$ (and already over the World Health Organization guideline of 10 µg/m$^3$). ER1335. The PHAP added to that baseline an estimate of the additional $PM_{2.5}$ concentration that would result from coal trains passing through Oakland. ER1336-37. Its calculations relied on the findings of a peer-reviewed study by Dr. Dan Jaffe that compared ambient $PM_{2.5}$ concentrations in the wake of trains carrying coal versus trains carrying other cargo, which isolated the difference caused by coal. *Id*. Based on Dr. Jaffe's findings, the PHAP concluded that coal trains *alone* would add between .25 and .625 µg/m$^3$ to ambient $PM_{2.5}$ concentrations. When added to the 11.5 µg/m$^3$ of $PM_{2.5}$ to which residents are currently exposed, these additional concentrations would cause $PM_{2.5}$ levels to exceed, or nearly exceed, the annual NAAQS in the community immediately adjacent to the terminal. *Id*.

The District Court rejected the Council's reliance on these calculations, reasoning that the Jaffe study's data were a product of "wind speeds, weather patterns, and geographic features of the Columbia River Gorge, not Oakland," and

the relatively "dustier" coal that trains carry in Washington State.  ER0028.  But the PHAP report explains that it *corrected for local conditions* by factoring local train speed and ambient wind patterns into its calculations.  ER1337 (PHAP estimates assumed "30 MPH train speed through Oakland" based on OBOT's submission to Council and incorporated seasonal wind patterns and speeds).  And the Council could have reasonably decided not to credit OBOT's assertion that the terminal would not handle "dustier" coal.  Given the 66-year term of OBOT's ground lease, nothing guaranteed that OBOT's claims about the terminal's likely immediate uses would remain accurate.

Moreover, the Jaffe study was the *only* study that specifically addressed $PM_{2.5}$ concentrations in the wake of passing coal trains.  Accordingly, it is *the* most germane extant evidence on the issue, and a source on which the Council could reasonably rely.  Under the substantial evidence standard, the District Court was required to draw all reasonable inferences from the Jaffe study to support the Council's determination.  *See Berkeley Hillside Preservation*, 60 Cal.4th at 1114.  The District Court should have recognized that, even if Jaffe did not study the *exact* context of the proposed terminal, the Council could still draw reasonable inferences from it, so long as the Council also understood the differences between the Jaffe study's context and conditions in Oakland (which the PHAP described in its report, ER1337).  By rejecting *the most relevant* academic study on the issue,

the Court essentially required the Council to conduct its own experiments on the issue. *See supra* at 46-47.[27]

The District Court's approach cannot be squared with the DA, which does not require air modeling, or any other methodology, to adopt new regulations. *See* §3.4.2. Under the substantial evidence standard, the District Court should have assessed the evidence before the Council and drawn all possible inferences in Oakland's favor, not made its own determination about additional evidence that "might have been helpful." *Gray*, 167 Cal.App.4th at 1125 ("[T]hat additional studies might be helpful does not mean that they are required"). Because the evidence before the Council was sufficient without air modeling *per se*, the court was required to reject OBOT's contract claim.[28]

---

[27] The Council could also reasonably determine based on other record evidence that any $PM_{2.5}$ emitted from the terminal would be transported to, and thus cause harm in, Oakland's residential areas. The PHAP report states that winds blow from west to east (i.e. off the San Francisco Bay, across the terminal, and into the City) "100% [of the time] in the summer" and "about 70% of the time" in the winter. ER1337. The City could reasonably infer that, during most of the year, the estimated $PM_{2.5}$ emissions from OBOT's activities would end up in Oakland's residential areas (especially the vulnerable West Oakland community *immediately* downwind of the terminal).

[28] The court's understanding of air quality metrics was also flawed. The court reasoned that exceedances of the daily NAAQS would *still not* justify the Resolution, because "seven exceedances of the [daily NAAQS] are allowed" each year before a region is out of attainment for $PM_{2.5}$. ER0029-30; *see also American Trucking Ass'ns, Inc. v. E.P.A.*, 283 F.3d 355, 367 (D.C. Cir. 2002) (NAAQS "permits monitoring stations to exceed the [threshold] two percent of the time, or about seven days each year"). But NAAQS exceedances do not become harmful only after seven have occurred. Roughly seven exceedances are allowed each year

## 2. Safety-related evidence before the Council

The District Court's review of the safety-related evidence before the Council was similarly flawed. Rather than consider that evidence cumulatively, the District Court focused on individual details that it wrongly believed undermined the substantial evidence of coal-related safety risks at the terminal. *See* supra at 20-21.

It is undisputed in the Council record that coal generates coal dust and releases methane gas, both of which are prone to spontaneous combustion, especially in enclosed spaces like OBOT's proposed enclosed conveyor and storage areas. ER0957-58, 1085-89, 1362-63, 1670. The evidence also establishes that fires at coal facilities are not uncommon and can be extremely difficult to extinguish. ER0958-59, 1088-90, 1093-94. A coal fire would pose catastrophic public health consequences for Oakland residents, who would be at risk of ingesting the dangerous compounds in coal (mercury, hydrogen cyanide, uranium) that are released and become bioavailable during combustion. ER0959.

Rather than crediting the Council's reasonable determination that these cumulative risks amount to substantial danger, the District Court dismissed

---

to prevent locations from falling into nonattainment because of "single high exposure event[s] that may be due to unusual meteorological conditions alone" (i.e. wildfires). *Id.* (internal quotations omitted)). And regardless of whether exceedances push a region into nonattainment, exceedances nonetheless represent days on which people are exposed to particulate matter at a level beyond that which "must be achieved to protect public health and welfare." *Alaska Dep't of Envtl. Conserv.*, 540 U.S. at 469.

Oakland's evidence on the bases that bituminous coal has a National Fire Protection Association ("NFPA") flammability rating "of 1 on a scale of 1 to 4 – the same rating that ground corn has," and that the City failed to consider the Oakland Fire Department's ability to "mitigate the project's risks" through its oversight of the OBOT's required fire safety plan. ER0033-34. Neither criticism undermines the City's reasonable determination based on the cumulative evidence before it.

First, the District Court's assumption that a low NFPA rating guarantees against spontaneous combustion is belied by numerous documented coal fires at shipping terminals, including recent fires at terminals in Los Angeles, Scotland, and Australia. In fact, coal dust explosions in "confined air spaces" (like covered railcars and OBOT's proposed enclosed terminal) are "well[-]documented." ER0957. Moreover, the NFPA system addresses only the *likelihood* of combustion, not the *magnitude* of harm posed by a combustion event. Uncontradicted evidence before the Council establishes that coal fires are difficult to suppress and that a fire could have catastrophic health effects on City residents, especially those in West Oakland (who already suffer disproportionately from pollution). ER0956-59, 1086-88, 1362-63. The City could reasonably determine that, given the *66-year* OBOT ground lease term, the magnitude of harm that would result from even one combustion event constituted a substantial danger. *See*

60

*Cavers*, 95 Cal.App.3d at 349 (whether danger is "substantial" depends on *both* "likelihood" *and* "potential injurious consequences" of the danger).

Second, the City could reasonably determine that the proposed terminal posed a substantial safety risk notwithstanding Fire Department oversight. OBOT's promise to "wholly encapsulate" coal-handing operations represented "a departure from practice at any other coal terminals," and thus relied on "unproven technology." ER1366. In fact, this promise to enclose coal-handing operations could exacerbate fire risk by increasing the concentration of coal dust in "contained spaces." *Id*. Given that OBOT proposed to construct a terminal that would use untested methods and the catastrophic consequences of a single combustion event, the City could reasonably determine that the fire-related dangers were too great, whatever the Fire Department's role.

## IV. Remand for Entry of Judgment for Oakland on OBOT's Contract Claim is Warranted.

For the foregoing reasons, the judgment must be reversed, and the case remanded for entry of judgment in Oakland's favor on OBOT's contract claim. Under the substantial evidence standard identified in Section 3.4.2, this Court should conduct its own review of the City's determination, without deference to the District Court's conclusions or consideration of extra-record evidence. *See Environmental Protection Info. Ctr.*, 44 Cal.4th at 479 (under substantial evidence standard, appellate court is "not bound by the trial court's conclusions"); *San Luis*

*& Delta-Mendota Water Auth.*, 747 F.3d at 604 (disregarding erroneously admitted extra-record evidence and reviewing agency action based on administrative record).

The evidence in the Council record is plainly sufficient to support the City's determination, under any conception of substantial evidence review. Because Section 3.4.2 requires review of that determination to be based *solely* on the Council record, all the relevant evidence supports Oakland's position. In criticizing that evidence, the District Court credited testimony and evidence that was never before the Council, relied on assumptions that are flatly contradicted by the record, ignored the credible consensus among the Council's experts, improperly made its own assessment of technical issues, impermissibly reweighed the evidence by deciding which experts' testimony to credit, and discarded evidence that addressed the court's concerns. Such criticisms do not undermine the evidence before the Council, which is "reasonable in nature, credible, and of solid value." *South Coast Framing*, 61 Cal.4th at 303. Accordingly, this Court should reverse and remand for entry of judgment in Oakland's favor. *See, e.g.*, *Trunk v. City of San Diego*, 629 F.3d 1099, 1125 (9th Cir. 2011) (reversing summary judgment for appellee and remanding for entry of summary judgment for appellant).

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment on

OBOT's breach of contract claim and remand for entry of judgment in Oakland's

favor on that claim.


Dated:  December 10, 2018           Respectfully submitted,

                                     */s/ Stacey M. Leyton*
                                    James M. Finberg
                                    Stacey M. Leyton
                                    Andrew Kushner
                                    ALTSHULER BERZON, LLP

                                    Barbara J. Parker
                                    Maria S. Bee
                                    Jamilah A. Jefferson
                                    OAKLAND CITY ATTORNEY'S OFFICE

                                    *Attorneys for Defendant-Appellant*
                                    *City of Oakland*

# STATEMENT OF RELATED CASES

The only related case pending in this Court of which the undersigned attorney is aware is Intervenor-Defendants-Appellants' appeal of the same District Court judgment (Case No. 18-16141), which has been consolidated with this appeal.

Dated:  December 10, 2018        Respectfully submitted,

                           */s/ Stacey M. Leyton*
                           Stacey M. Leyton

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   18-16105; 18-16141

I am the attorney or self-represented party.

**This brief contains**   13,999   **words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/Stacey Leyton*          **Date**  12/10/2018

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                    65                    *Rev. 12/01/18*